Case No. 22-1029, United Parcel Service, Inc. Petitioner v. Postal Regulatory Commission. Ms. Sullivan for the petitioner, Mr. Shih for the respondent. Morning again, Counsel. Good morning again, Your Honors, and may it please the Court. Kathleen Sullivan for UPS. We turn now to a case that partially overlaps the case we just discussed and partially is from our prior discussion. We do argue here, consistent with our argument in the 1006 docket, that the orders conflict, the orders concerning seasonality costs, by which we mean package peak, seasonal peak package costs, which we think the record is undisputed, that costs go up in December because when people send out a lot of packages to coincide with the holidays in December, the Postal Service hires tens of thousands of temporary employees, substantially increases overtime, creates new special purpose routes, and acquires additional facilities. Those, there is indisputably a seasonal spike in costs, and we believe that at a minimum, the Court should remand in the 1029 docket for the same reasons we just argued in the 1006 docket. The Postal Service has, and I would argue by definition, said that it is not going to look for and has not found any seasonal costs that are uniquely or disproportionately associated with competitive products. I think the only question there, Your Honors, is did we adequately preserve that A3-3633B argument in the 1029 docket, and the answer is we unequivocally did. I refer, Your Honors, to JA-12, where the UPS petition raised the issue in the 1029 docket, JA-232 to 233, where the Commission responded to our disproportionately associated costs argument, so it addressed the docket. It can't be waived if the Commission discussed it. In the motion for reconsideration, we asked again. We said JA-247 to 48. We don't agree with your reasoning. Remember, of course, the Commission erroneously, I think they would admit it was erroneous, they cited in 2021 back to Order 4963, which this Court had vacated and remanded in the 2020 decision, so we moved for reconsideration, and then the Commission rejected the argument again. I don't need to belabor the A3 point. Can I ask about that? Yes, Your Honor. About the preservation of the A3 point. I mean, it just, the thrust of it seems to be, and if we start with A-12, which is where it was launched, is that it's just flagging that there's an institutional cost question, but then just saying, yeah, but that's dealt with in this other proceeding. Really, this is about, not an institutional cost, this is about attribution, and it just seemed to be kind of a, don't, we want to make sure we put a marker here, but the marker is really going to be dealt with elsewhere. Your Honor, we don't suggest that you have to, that the Court needs to go into a detailed, we're incorporating by reference, in effect, the arguments in the other docket, but all we would suggest is that it would have the result that if in 10-06 you agree with us, you should, the Court should remand not only in 10-06, but also in 10-29, including for the disproportionately associated costs failure on the part of the Commission. So, Your Honor, we did put a marker. We didn't, it doesn't need to be belabored in a decision in this docket. All we want to do is say that, or, in a way, this is the textbook example of our point in the 10-06 docket, because here we have a case in which there is clearly disproportionately associated cost, that is, some costs more associated than not with competitive products, because people send more packages in December, and they send less market-dominant products in December. So, it's a textbook example of the 10-06 docket. We don't think it needs detailed analysis beyond the 10-06 docket. We would just say that we preserved it in the 10-29 docket as an independently sufficient reason for remand in that docket. But perhaps I could turn now to what's new about this case, which is the cost attributable argument. Here we do make an argument under A-1 and A-2, and I want to really focus on A-1 here. It's A-1, which was not addressed by this Court in the 2018 order or the 2020 order. 2020 was about A-3. The 2018 decision of this Court was about A-2. Really, this is a case in which the Commission has defied and acted contrary to law with respect to 3633A-1. And why is that? Because this is a case in which competitive product volume decreases in December. I said it backwards. Competitive product volume increases in December. Market-dominant product volumes decrease in December. That's undisputed. We have a chart at JA-54 in our comments before the Commission that cites to undisputed data. That point is not disputed. And where that is the case, it is a failure under A-1 if the Commission says, well, if you eliminate competitive products altogether, that's the incremental cost test, it wouldn't lead to any change. Eliminating competitive products altogether would eliminate costs that the Commission has failed to take into account. Just to go back to text of A-1, A-1 says there can't be cross-subsidization. That, at a minimum, means that the Postal Service has to have competitive products cover costs that would be eliminated if competitive products were removed altogether as a class. But the Commission has failed to do that. The Commission, it is undisputed, except the facts are undisputed, it's undisputed that market-dominant volumes decrease in December, competitive product volumes increase in December. The only response we hear from the Commission is, oh, but hold on, first-class mail goes up in December. But that's not the relevant comparison. The comparison is between the buckets of two types of products, market-dominant products as a whole, competitive products as a whole. I think part of their answer, too, is that to the extent competitive products are, you know, driving more activities in December, that will be captured in the distribution keys for, you know, that quarter. And I'm not sure I totally understood the response to that, to that argument, that they're already capturing it, at least to an extent. So, Your Honor, that's not good enough because the, let's start with the Postal Service's admission. The Postal Service treats much of the costs as institutional. So we've argued about how many of these seasonal spike costs are going into the institutional buckets because they're not being captured by the driver methodology and the cost attributable methodology. We say $500 million, but the Postal Service admits $250 million. So if the cost attribution methodology is not capturing all these seasonal spike costs, and we know that from the Postal Service's own admission, for that, I would refer Your Honors to the Joint Appendix at 2-11, the Joint Appendix at 197. This is where 197, our comment at 2-11, cites to the Postal Service's own presentation to the Commission. I think the number on page 197 is actually 243, and we rounded up to $250 million. But that's still a lot of costs in the institutional bucket.  It says at the bottom that that figure represents only 3.7% of December costs. And my takeaway from that was that that must mean a lot of this December spike is being attributed under the USPS analysis. But I'm just not sure I'm piecing it all together. I can't answer that directly, Your Honor. I'll have to go back and check. If there's anything to clarify, we'll be happy to do it. But what I'm really getting at is if it's conceded that the cost attributable methodology is not capturing all of the seasonal spike, there is an obligation under that. It's proof perfect that A1 is not being satisfied. A1 can't be satisfied if it's not capturing the entire result of the seasonal spike. I've already said that to the extent in the institutional bucket, they have to analyze it under A3, but we've covered that already. So why does this matter? This matters because if we concede the incremental cost test asks what costs would disappear if competitive products did not exist? And the commission tells us none. If you took away competitive products as a whole, it wouldn't eliminate any of their costs. And that is, it's illogical. How do we know it's illogical? Look to JA86. We have a presentation there that cites two The Postal Service, when it adds up all the A2 costs in its attribution methodology, comes up with a number that's essentially the same as its A1 number. To put it more precisely, at JA86, you'll see that if you sum the incremental cost of every competitive product and add them all up, it comes out to a number that's only 2.9% below the incremental costs for competitive products as a whole. That's the Postal Service's own analysis. That can't be so. It can't be that if you eliminate a product, the sum of the elimination of the individual competitive products adds up to the same sum as eliminating all of the operational costs that go with competitive products as a class. The trucks, the scanners, the additional size of the trucks, the additional sophistication of the scanners to handle packages rather than just letters. So what we're asking here is very simple, which is hold the commission to its own methodology. We lost that fight in 2018. We're not here to refight it. Use incremental cost methodology. But when you do it, A1 requires you to examine the cost that would disappear but for the existence of competitive products as a whole. And I think the data I just gave you that's cited at JA86, we looked at A2 and A1 and they come up to the same amount. That can't be right. Again, Judge Rogers, Congress doesn't enact separate provisions idly. A1 is a different command than A2. A1 asks them to look at the coverage of competitive costs, competitive product costs as a category. A2 asks them to look at the coverage of competitive products individually. It can't be that those two processes get you to the same number and are synonymous. Now, again, Your Honor, we proposed better ways to do this. They don't like our methodology. We're not saying adopt our methodology. That's the dispute. But even if the Postal Service quantifies the unexplained cost increase itself at nearly $250 million, there's got to be something wrong with the commission's methodology. You don't have to adopt theirs, but you have to command the commission to follow the text of A1. That's the urge. Can I ask a question about our standard of review? Yes, Your Honor. This is a denial of a petition for rulemaking. And we have a line of cases stretching back to we apply an especially deferential standard of review in that type of a case. Now, I appreciate the commission hasn't cited those, so certainly a question for them as well. But is there some reason that deferential standard wouldn't apply here? Well, yes, Your Honor. I'm aware of the standard. It wasn't cited. What I think is the reason not give deference here is the same reason this Court gave at the 2020 order, which is that the denial of the proposed rulemaking is not reasoned or its reasoning is not adequately explained. And I think the answer to the question is you can't be following A1 if your A2 analysis gets you to the same number as your A1 analysis. That plus the Postal Service's admission that there are $250 million or $243 million of costs that are not being attributed but are going off into the institutional bucket. Those facial features of the record here suggest that deference is not appropriate because they are a failure to follow the law, A1, and a failure to give a reasoned explanation of the failure. So we don't think special deference is required here either by the procedural posture or by Chevron. We think it's a case of appropriate legal scrutiny by this Court. I'll reserve the remainder of my time for rebuttal. Thank you very much. Thank you, Counsel. Mr. Sheehy? May it please the Court, I am still Mike Sheehy and I'm still here for the Commission. I want to begin by zooming out and focusing on what the Commission identified as the core problem in UPS's proposal, that it's premised on the existence of an attribution gap that in the Commission's view just doesn't exist. And so the underpinning of my friend on the other side's argument is that there's this vast number of, quote, unexplained peak season costs that the Commission has failed to classify as attributable costs. But as the Commission concluded, UPS's almost seems designed to create the impression of an attribution gap where no such gap exists. And nowhere in their briefing in this case does UPS really take issue with the Commission's criticism of the methodology that UPS put forward for the existence of such a gap. So what they rely on instead, and this comes out most clearly in their reply brief, is the so-called admission by the Postal Service that there is an attribution gap of roughly $250 million or billion dollars or, you know, $250 billion. And the intervenors' brief at pages 15 and 16 make clear that that simply mischaracterizes what intervenors are actually saying. And throughout the intervenors' brief, they instead explain that what the Postal Service was really saying there was they were just adopting UPS's arguments and then saying, you know, this is how we're going to describe what UPS is arguing and, you know, we're going to use that terminology to try to rebut them. And, you know, what those costs actually are, they're not unexplained in the slightest. They're institutional costs. They're the peak season costs left over after the costs attributable to competitive products have already been baked into the price floors under Sections A1 and A2 of the PAEA. And so, you know, this makes sense, as the Commission explained, because of what these costs are. So most peak season costs, according to the Commission, actually fall into one of two categories with respect to, you know, costs in the institutional bucket, that is. They are either network costs, which are costs of maintaining delivery and processing and networks along those lines, or costs for activities associated with broad groups of products as opposed to competitive products alone. And so the Commission, in that way, explained why the UPS's so-called gut instinct that there must be more of an association, more of a causal relationship than the existing costing methodology accounts for is just incorrect. And what this case seems to actually be about is a collateral attack on how the Commission is implementing that cost attribution methodology, which this Court upheld in 2018 and which the other side just acknowledges that, you know, they can't challenge. What they're saying is we acknowledge that the Commission is already treating a portion of these costs as attributable. We think that the Commission ought to treat a lot more of them as attributable than the they lost that fight in 2018 with respect to the use of incremental costs under Section A2. And with respect to the use of incremental costs under Section A1, on which my friend on the other side has focused her argument, I would remind the Court that UPS actually agreed with the methodology that the Commission used to calculate whether there was improper cross-subsidization when that regulation was first promulgated. And UPS, as I understand it, doesn't challenge the use, the continued use of incremental costs to measure cross-subsidy in that context either. What they're really saying is in deploying these methodologies, the Commission is doing it wrong because there must be this gap. And because your methodologies don't account for that gap, then there's something wrong in the way you're accounting for these costs. One question at the outset. Can I just ask, do you disagree with the proposition that that as a class, not within the class, but as a class, market-dominant product costs go down in the last month and competitive product costs go up? So in part. And so what the Commission said about that is, you know, UPS's evidence of the volume decline of market-dominant products generally reports averaged indexed volumes as opposed to the actual volumes, which, as the Commission made clear on page 230 of the JA, can exaggerate the significance of these volume shifts. But, you know, the other piece of it that UPS is missing, of course, is that, you know, not all market-dominant products are the same. First class mail is a very, very, very, very big part of market-dominant products. And there is a December volume spike for first class mail that can also explain a lot of these costs in the institutional costs bucket. And UPS hasn't really demonstrated that the remaining institutional costs, right, the costs that are not already attributed using the existing distribution keys, you know, that the remaining institutional costs bear a reliably identified causal relationship or even a uniquely or associational type relationship with competitive products generally or with competitive products specifically. And even if the other, the non-first class market-dominant products offset the extent to which the first class market-dominant products may go up in volume, as a class across the board market-dominant products still go down. As a class across the board, my understanding of what the commission said is that there is potentially a diminishment, but there is definitely an increase in the volume of first class mail. There is an observable first class mail volume spike. And so although UPS simply asserts that all market-dominant products are the same, there's in fact, the commission came to the opposite conclusion based on the evidence that it had available. But this illustrates another feature of UPS's proposal that I want to emphasize, which is that UPS is laser focused on what it calls peak season months, but totally ignores non-peak season months, which also exist. And so if UPS is really committed to its proposal, and it really thinks that the cost attribution methodology is really wrong, what UPS ought to have proposed was, you know, to take account not only of peak season increases, but of non-peak season decreases. And indeed, you know, one of the problems with UPS's methodology that they don't respond to is that it produces volume or the so-called attribution gap goes the other way when applied to months where there isn't a peak season. And by focusing on the one without focusing on the other, they're giving a skewed view of seasonality changes. And so that's the reason why the commission decided to stick with its existing use of distribution keys, which apply quarterly, and in consequence, will capture any volume increases in December. Now, my friend... Can you respond directly to the... So they, as you said, are focusing on A1, and the jumping off point for them is page 86 of the appendix. And there's certainly an intuitive appeal to the idea that the number that you would get if you truly asked what would happen if we offered no competitive products at all should be significantly more than just the sum of each product at each time. Maybe, you know, your answer, you know, on trucks, you just wouldn't need the same size of trucks, or maybe as many, if you just got out of this giant line of business altogether. And so could you just sort of walk through your response to that and the point about page 86? Yeah, so the point on page 86 of the JA is an assertion that there is going to be significant reconfiguration of the postal services products if it just stopped producing competitive products. And the commission has rejected that throughout, both in the prior docket, actually, and in this docket, right? So one thing UPS has always said is that the postal service is identical to a private corporation. If it stops producing certain lines of products, then it could immediately just revamp its operations to become more efficient, you know, just like any other private company. And what the commission has said in response is that that's just not the case. The postal service is not any old private company. The postal service is, you know, governmental and is subject to the requirements of the PAEA, and also subject to requirements that it maintain a nationwide delivery network to go to, you know, every delivery point, basically every mailbox in, you know, everywhere in a city as far away in rural places and all across the country, including in Alaska and Hawaii. So it can't do the sort of specifically to the question about where can we look in the order to find them? Because when I read JA-235, sort of confront this argument that UPS says our models assume our operations are fixed. That's incorrect. And the next sentence essentially says we're constantly upgrading our costing system. It doesn't explain why you would not be able to revamp your operation. USPS wouldn't be able to if, in fact, it got out of the package. So this has been, as I said, a through line in UPS's arguments throughout this space. And so a significant discussion of it does come in the other docket that we were discussing today in the prior case where UPS makes the exact same argument. And the commission makes very clear that the argument about being able to revamp one's operations are, that just doesn't really reflect the operational realities of the Postal Service. To the extent that you think that that's not adequately presented on page, you know, JA-235 or the other places of the discussion, I don't think a remand would be necessary for the commission to address that point. As this court explained in a case, I think, called Taurus Records, where it would be pretty clear what the commission was going to say. A remand would just serve no purpose at that point. And so, you know, here it's very clear what the commission is going to say. Indeed, I think there's a discussion of precisely this point about revamping postal operations in the absence of competitive products in the prior docket. And it's discussed here that, you know, to the extent that revamping does occur, the Postal Service does modify its costing system to meet those operational realities. And so, you know, given the combination of the commission's thorough refutation of this argument, which, you know, the commission has consistently pointed out throughout its postal rate making, and given the commission's discussion of why it doesn't believe any alteration to the incremental cost methodology is needed at this time, you know, we submit that remand would not be appropriate. The other thing that Your Honor asked about, though, was why the numbers for incremental cost with respect to A1 and, you know, what additive costs are under A2 are roughly the same. And the fact is that there's no basis for UPS's assertion that there should be a massive gap. And that's because we use the exact same methodology for both A1 and A2, but we apply it slightly differently. And so for A1, what the commission does, and again, UPS concurred with this methodology, doesn't dispute this methodology. What A1 does in the prior docket, and although it throws shade on the results that the methodology gets, you know, what UPS can't say is that we should depart from the incremental cost test. What the incremental cost test does is it measures what would happen if every single competitive product as a group ceased to be The inquiry under A2 is slightly different. It's, you know, the incremental cost is applied to individual products. And so the commission asks what cost would disappear if the commission stopped producing a given competitive product. And so, you know, the reason they get to the same result or, you know, there isn't this massive difference is because of, you know, the fact that A1 and A2 both depend on the incremental cost methodology. And again, with respect to A1, UPS previously conceded that it was reasonable. And with respect to A2, this court has held that the use of incremental costing as a methodology was reasonable in 2018. But I want to back up and just say again, right, UPS's case really does rest on an assertion that the existing methodologies are flawed because of the perceived attribution gap. And I want to reemphasize that UPS has now abandoned its own methodology for proving the existence of such an attribution gap and that UPS's heavy reliance on what the Postal Service said just misunderstands the Postal Service's discussion of that 250. And, you know, so at the end of the day, the petition is requesting relief to solve a problem with the attribution methodology that the commission in its judgment has determined does not exist. Can I follow up on a question that was raised earlier, which is that this involves a petition for rulemaking? Yes. So why is it that those standards that, you know, incorporate principles of prosecutorial discretion and other discretionary considerations that attend a petition to get involved in something aren't part of your submission in the briefing? Your Honor, we focused instead on it. It was a little hard to figure out what UPS was arguing in its opening brief because UPS's opening brief kind of walks away from demanding that this court adopt any of the methods that UPS says you want to adopt and instead just focuses on these broad concerns about existing incremental costs methodologies being not capable of capturing the, you know, alleged attribution gap that exists. But certainly, you know, we agree that to the extent that what UPS is asking for is, you know, we demand that the commission do rulemaking of this sort, you know, I see no reason why those additional standards wouldn't apply. But, you know, to be clear, that is what happened, right? I mean, that's what this case seeking review of is. That's right, Your Honor. The petition is a little bit confusing. On the one hand, the petition says we demand that you adopt this particular mode of, you know, calculating these peak season costs for purposes of attribution and in the interim you do this interim thing. But then the commission launches, the petition launches what the commission took to be just a broader attack on the methodology writ large and said, you know, your continued use of this methodology is arbitrary and capricious for a variety of reasons. And so, you know, certainly we don't dispute that to the extent that what they're asking for is an affirmative rulemaking by the commission, those standards would apply. But regardless, as the commission's order makes clear, its reasoning can be sustained under any standard and is a faithful summary of analysis of the underlying econometric arguments that UPS is putting forward in service of proving that there is an alleged gap in attribution. Make sure my colleagues don't have additional questions for you. No. Thank you, Mr. Shade. Judge Rogers, did you have a question? No, thank you. Thank you, Mr. Shade. Solon, we'll give you three minutes for rebuttal again. Thank you, your honors. Three quick points. The standard of review, there is no deference to the PRC to refuse to apply its own test. We are not challenging how, what its methodology is. We are saying that, the point is not that they're looking at these A1 costs the wrong way, costs that would disappear but for competitive products. We're not looking at it at all. They're refusing to apply incremental cost testing. No deference, no prosecutorial discretion in that kind of refusal. So that, I think, is the answer on standard of review. Second, Judge Garcia, I wanted to get an answer to you on JA-197. This is on the size of the attribution gap. And your honor asked, well, isn't, doesn't page A-197 in the Postal Service presentation say that these unexplained costs represent just 3.7% of peak season costs? I now have the answer, your honor. It's 3.7% of total December costs. But it's a higher percentage of the seasonal spike in costs, which is the, what we think the incremental cost test should be capturing here, by looking at how that seasonal spike would disappear but for competitive products. And the answer, your honor, why this is, the 3.7% of total, it doesn't matter, is because the total seasonal spike is about $977 million. Your honor, that's cited at JA-31. So the $243 million of unexplained costs by the Postal Service's own admission is a very substantial percentage of the seasonal spike. It's, you know, almost a quarter that's unexplained. And last, your honor, Mr. Sheehan, the revamping point, just to summarize our position on revamping is, if the Postal Commission applied its methodology as, just applied its methodology, we're not challenging the methodology, if they applied it, they should determine that if the Postal Service stopped delivering packages altogether, it would be able to revamp and take a number of steps, this is intuitive, to make operations more efficient. It would not need to purchase giant trucks for package delivery, specialized scanners for packages, seasonal increased variable costs like seasonal employee size. It would be able to scale down given the Mr. Sheehan finally did admit under the court's questioning that market-dominant products as a class decrease in the seasonal period when competitive products increase in volume. So revamping could occur. I think I heard Mr. Sheehan's only answer to that is revamping couldn't occur immediately. The Postal Service would not be able to revamp operations immediately. But that's exactly the problem. There's nothing in the current application of the incremental cost test, it doesn't require immediate changes, what we're asking for is that they apply their methodology so that they could revamp over time. And those changes would, a number of operations that are not captured by the attribution methodology as it's being applied today would disappear over times if competitive products did not exist. It's simply implausible. There is no such spike-related incremental cost at all. So we respectfully ask that you do remand, notwithstanding that it was a request for rulemaking because there's no deference here, it's a refusal to apply. The very test that this court allowed them to apply, we don't challenge the test, we challenge its failure to be applied. Thank you very much, Your Honors. We appreciate the extra time you gave UPS for the arguments today. Thank you. Thank you, counsel. Thank you to both counsel for your arguments in this case and the other one. We'll take these cases under submission.
judges: Srinivasan, Garcia, Rogers